UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                          :

UNITED STATES OF AMERICA,         :

      - v. -                 :      12 Cr. 864 (LAP)

MARK GOLDBERG,            :

                                          :

               Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

                                               PREET BHARARA
                                               United States Attorney for the Southern
                                             District of New York

STANLEY J. OKULA, JR.,
JORGE ALMONTE,
Assistant United States Attorneys

       - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :

UNITED STATES OF AMERICA,        :

       - v. -                   :       **12 Cr. 864 (LAP)**

MARK GOLDBERG,            :

                                        :

                    **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, hereby respectfully submits a memorandum in aid of the sentencing of defendant Mark Goldberg (hereinafter, "defendant" or "Goldberg"), currently scheduled for June 10, 2014.   As set forth more fully below, the Government respectfully requests that the Court sentence Goldberg to a term of imprisonment within the advisory U.S. Sentencing Guidelines of 57‒71 months of imprisonment and further order a money judgment of $500,000, representing the amount of the criminally forfeitable assets traceable to the defendant's mail fraud offense, which Goldberg no longer contests as part of his Plea Agreement.   Additionally, the Government requests that Goldberg be ordered to pay restitution in the amount of **2,727,381.77** to the United States of America and the State of New York, for the actual losses caused by his preparation of false and fraudulent federal income tax returns filed on behalf of himself and his clients, after having been given credit for any amounts that the Government has recovered to date or thwarted through the

diligence of governmental authorities.

I.    **INTRODUCTION**

On August 13, 2013, Goldberg pled guilty before this Court to three counts of the Indictment in the above-captioned matter pursuant to a Plea Agreement, namely: (a) Count Thirty-Four, charging the defendant with aiding and assisting in the preparation of a false and fraudulent U.S. Individual Income Tax Return for tax year 2011 for a taxpayer identified by the initials M.S., a family relative of Goldberg, in violation of 26 U.S.C. § 7206(2); (b) Count Forty-Four, charging the defendant with subscribing to a false and fraudulent U.S. Individual Income Tax Return for tax year 2011 on behalf of himself, in violation of 26 U.S.C. § 7206(1); and (c) Count Forty-Six, charging the defendant with Wire Fraud in a scheme to defraud the Internal Revenue Service ("IRS") and the New York State Department of Taxation and Finance ("NYS Tax") through the preparation and filing of false and fraudulent Federal and New York State income tax returns for the tax years 2004 through 2011, in violation of 18 U.S.C. § 1343.

According to the evidence gathered in the course of the criminal investigation, Goldberg began working as a paid tax return preparer approximately in 2004.    In this capacity, Goldberg operated his tax preparation business using several business names over the years, including MG Business Group, Inc. ("MG") and E&M Multi Services, Inc. ("E&M").    MG was listed as the paid preparer firm on tax returns prepared by Goldberg in tax years 2008 and 2009, while E&M was listed as the paid preparer firm on tax returns he submitted in tax years 2010 and 2011. Initially, Goldberg prepared tax returns from his apartment, located on East 195th Street, in the Bronx, New York.    In those early years, Goldberg prepared a maximum of 300 federal returns in any single tax season, with tax year 2010 being approximately 200.    For the tax year 2011,

Goldberg moved his business to a storefront located at 650A Westchester Avenue in the Bronx. That year alone, Goldberg submitted over 2,300 federal returns and roughly the same amount of state returns.

Goldberg prepared and electronically filed income tax returns for a myriad of clients, many from the low-income areas where he operated his business.   Goldberg advertised his services by flyers and word-of-mouth, and it soon became known within the neighborhood that a visit to Goldberg resulted in each client obtaining "free money."   Although Goldberg claims that he subsequently attempted to defuse the rumors regarding the alleged "free money" from the recently deceased Whitney Houston and Steve Jobs, or that it was "Obama money," Goldberg's client base exploded when many local residents realized that they could receive a pre-paid debit card soon loaded with cash simply by providing their social security and identification information.   Many of the unsuspecting, misinformed, and uneducated individuals who visited Goldberg's office were unaware that tax returns were being filed on their behalf with the IRS and NYS Tax, or that Goldberg was charging his fees from a portion of the refunds.   Predictably, the investigation established that while Goldberg certainly delivered funds to his patrons, he did so through the preparation and filing of tax returns that were patently and egregiously false --- primarily for their refund claims based on fraudulent higher education deductions and refundable tax credits.

Although Goldberg initially reserved in his Plea Agreement the right to challenge the Government's relevant loss computations at a hearing before this Court conducted in accordance with United States v. Fatico, 603 F.2d 1053 (2d Cir. 1979) (hereinafter, "Fatico hearing"), he ultimately chose not to contest the findings of the U.S. Probation Department in the Presentence

4

Investigation Report ("PSR"), which concluded that the thousands of fraudulent tax returns Goldberg prepared, or caused to be prepared, on behalf of his clients during the tax years 2006 through 2011, including those described in the Indictment, resulted in a tax loss to the Government exceeding $2.5 million dollars.[1]

Meanwhile, the submission of the above-described client returns generated substantial tax preparation fees for Goldberg, ranging from $250 to $700, on average.   Despite this, Goldberg failed to report any of this income activity to the IRS or NYS Tax on his individual income tax returns.   To add insult to injury, an investigation of the defendant's tax filings revealed that Goldberg used many of the same fraudulent methods he employed on his clients' returns when preparing and filing his own personal tax returns for the years 2005, 2006, 2007, 2010 and 2011. This included falsely claiming tax withholdings from a non-existent job with the City of New York's Department of Buildings, his former employer, which generated thousands of dollars in ill-gotten refunds for Goldberg from IRS and NYS Tax.   Goldberg does not contest that he caused an additional $97,382 in tax loss related to his personal tax filings.   When combined with the tax loss resulting from his clients' false returns, the total loss for sentencing purposes is

---

[1]       On April 28, 2014, the Court endorsed the parties correspondence to the Court, dated April 22, 2014, wherein it was represented that the sentencing hearing previously scheduled for May 13, 2014, would no longer be necessary as the defendant was waiving the Fatico hearing he had previously sought.   See D.E. 36.   In particular, the parties jointly represented that "there will be no factual disputes with respect to the contents of the Probation Department's Pre-sentence investigation report."   Id.   In his most recent Sentencing Submission, dated May 27, 2014, the defendant now seems to contest a portion of the tax loss computations made by the Probation Department.   See D.E. 37.   While any alleged dispute with the loss computations must be deemed waived as there was no objection to the Probation Department's factual findings, the Government will nonetheless address each the defendant's contentions below.

11511328.1

approximately $2,786,993.[2]

## II.    BACKGROUND AND PROCEDURAL HISTORY

The case against Goldberg began with an investigation undertaken by NYS Tax and the Bronx County District Attorney's Office.   Goldberg came to the notice of local law enforcement because of the large crowds of people lining up on the street in front of E&M, and also stretching up the staircase to his office at 650A Westchester Avenue in the Bronx.   Many clients came in search of the alleged "free money" coming from Goldberg's office.   Of course, this flow of funds was the direct consequence of Goldberg's fraudulent preparation of returns. The investigation conducted by the District Attorney's Office included an undercover operation corroborating the fact that many taxpayers were simply dropping off their identifying information and filling out paperwork for their pre-paid debit cards, with no substantive tax questions ever being asked.

Goldberg was ultimately arrested on April 18, 2012 on state charges and search warrants were executed upon the E&M office and at Goldberg's apartment on that same date.   After being advised of his custodial rights, Goldberg agreed to be interviewed by local law enforcement.   Goldberg admitted to being the owner of E&M and also identified a bank account at Capital One Bank in the name of E&M over which he maintained exclusive control. Goldberg represented that the funds on deposit were directly tied to the fees he derived from his tax return preparation business.   The District Attorney's Office later obtained a seizure order for

---

[2]     As the U.S. Probation Department noted, while many of Goldberg's clients were ultimately unsuccessful in receiving all of the fraudulently requested federal and state tax credits due to circumstances beyond their control, the defendant clearly intended to cause those losses to the Treasury when he electronically submitted and filed the fraudulent returns.   See PSR ¶ 30.

11511328.1

this account and Capital One Bank issued a check, payable to the District Attorney's Office, in the amount of $403,915.61.

Because Goldberg's tax preparation mill involved the large-scale preparation of federal income tax returns, in addition to the state tax returns, the District Attorney's Office requested that the investigation be assumed by the United States Attorney's Office for the Southern District of New York, in conjunction with the IRS.   A federal Indictment was consequently returned against Goldberg on November 19, 2012, charging him with 40 counts of aiding and assisting the preparation of false and fraudulent tax returns for his clients; four counts of signing and filing fraudulent tax returns for himself; one count of obstructing the IRS; and one count of engaging in a wire fraud scheme to defraud the IRS and NYS Tax.   See Docket Entry ("D.E.") 1.   The Indictment also included forfeiture allegations concerning all of the proceeds traceable to the wire fraud offense.   Id.

Shortly after the return of the federal Indictment, the Government filed a seizure warrant application on December 3, 2012, concerning the funds that had been seized by the Bronx District Attorney's Office.   See D.E. 2.   The basis for the federal application was the assertion that there was probable cause to believe these funds constituted or were derived from proceeds traceable to the commission of a scheme to defraud committed through the wires, in violation of 18 U.S.C. Section 1343.   As such, the property was subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (b).

In the Plea Agreement executed by Goldberg, accepted by the Court on August 13, 2013, the defendant agreed that a forfeiture judgment in favor of the United States was to be entered by the Court at sentencing on the full amount of proceeds traceable to the commission of the wire

11511328.1

fraud offense, determined to be at least $500,000.   The Cashier's Check issued by Capital One Bank, dated April 27, 2012, in the amount of $403,915.61, and made payable to the Bronx County District Attorney's Office, is already in the lawful custody of the United States pursuant to this Court's Order dated December 11, 2012, see D.E. 3, and this amount should be credited against the defendant's total forfeiture judgment.

## III.   RELEVANT CONDUCT

### A.   THE TAX PREPARATION BUSINESSES

Goldberg can be said to be a victim of his own success at committing large-scale fraud. The investigation established that the primary manner by which Goldberg obtained the allegedly "free money" for his clients was through the filing of bogus tuition tax credits, namely the federal American Opportunity Tax Credit and New York State's College Tuition Credit.   Many of the tax returns Goldberg prepared for his clients also included false and fraudulent Schedule A-Itemized Deductions, Schedule C-Profit or Loss from Business, Schedule E- Supplemental Income or Loss, and Form 8863-Education Credits.   The returns were filed electronically with the IRS and NYS Tax.   After Goldberg had his Electronic Filing Identification Number ("EFIN")[3] rescinded by the IRS due to his prior history of filing false income tax returns, he used other EFINs to electronically transmit returns.   In particular, on or about January 19, 2010, Goldberg caused one of his employees, Patricia Nuñez, to apply for an EFIN on behalf of MG,

---

[3]      The IRS assigns a unique EFIN to identify firms that have completed the IRS e-file Application to become an Authorized IRS e-file Provider.   After the provider completes the application and passes a suitability check, IRS sends an acceptance letter, including the EFIN, to the provider.   Providers need the EFIN to electronically file tax returns.   EFINs are not transferable.   The principals of the firm use either their Social Security Number or Employer Identification Number to apply for an EFIN.   See www.irs.gov for more information.

11511328.1

which he used to submit the 2009 tax year returns.   On or about November 15, 2010, Goldberg caused his father, Stuart Goldberg, who at the time was living in an assisted living home, to apply for an EFIN for E&M and, in the following month, also had him apply for a Preparer Tax Identification Number ("PTIN"),[4]  which Goldberg used to submit the 2010 and 2011 tax year returns.   During the period of time from 2005 and 2012, Goldberg prepared and filed thousands of returns with the IRS and NYS Tax, the majority of which were transmitted electronically using EFINs and PTINs assigned to other individuals.

When the Bronx District Attorney's Office was leading the investigation, an undercover investigator with NYS Tax joined the crowd of people waiting to go into E&M.   An individual associated with E&M repeatedly told the queued clients over a bullhorn that they needed only their social security number and identification, reminding them that "if you have filed taxes, go home.   There is no free money.   This is income taxes.   Nobody died."   After a considerable time in line, the undercover finally met with an employee at E&M.   It was explained to the undercover that all he needed to do to obtain his money was to furnish his name, social security number, address, and telephone number, as well as sign a piece of paper.   He was to return in approximately 6 weeks to receive the refund, which was paid through a debit card.   There were no tax questions asked of the undercover.   Later, when the case was assumed by the United States Attorney's Office and the IRS, interviews were conducted with a number of Goldberg's

---

[4]      A "PTIN" is a number issued by the IRS to identify paid tax return preparers. Every individual who, for compensation, prepares or assists in the preparation of a tax return or claim for refund must have his or her own PTIN.   The PTIN is used as the tax return preparer's identification number and, when applicable, must be placed in the Paid Preparer section of a tax return that the tax return preparer prepared for compensation.   See www.irs.gov for more information

11511328.1

clients, including some of his relatives.   These clients described varying experiences and degrees of contact with Goldberg, yet all substantiated that their returns were prepared and electronically filed by Goldberg's firm and that they contained false material matters, including fraudulent filing statuses and incorrect income and expense claims.

Goldberg used TaxWise return preparation software for the tax years 2010 and 2011. The returns prepared by Goldberg were electronically transmitted to TaxWise and were forwarded electronically to IRS processing centers, primarily in Andover, Massachusetts.   The New York State tax returns were electronically filed with NYS Tax in Albany, New York. TaxWise also transmitted tax returns claiming refunds to Refund Advantage, a payment processing business that Goldberg used to deduct his tax preparer fees from the clients' refunds. The fees were electronically deposited into Goldberg's business bank account.

Goldberg offered his clients income tax refund services for the 2011 tax year that utilized several processing companies.   One manner in which refunds were paid was through pre-paid debit cards.   The company that facilitated this manner of paying refunds was Futura Card Services ("FCS").   Before the return was filed, the client's identification and an activation number associated with a specific FCS debit card was entered electronically and sent from E&M to FCS.   In turn, FCS assigned an account number and routing number for the particular FCS card to be given to the client.   The client's account and routing numbers were entered on the tax return transmitted to TaxWise from E&M, with this account information used to load the debit card with the refund.   Goldberg offered his clients the ability to pay his fees through deductions from their refunds, and this service was provided by Refund Advantage.   Most of Goldberg's clients agreed to this method of paying his fees, while others were not aware that fees were being

11511328.1

deducted from their refunds.   For tax year 2011 alone, Refund Advantage had wired more than $500,000 in fees to Goldberg's account at Capital One by April 2012, just before the state charges against him were revealed.

Goldberg had a number of employees and their primary function was to enter the client's identifying information into the FCS virtual terminal for assignment of routing numbers, account numbers, and the FCS prepaid cards.   Goldberg's employees also took copies of the client's tax return information, if they had it, and handed out the FCS prepaid debit cards.   Goldberg prepared the tax returns or instructed his employees on what to include.   Many of Goldberg's employees had no prior tax knowledge before working at E&M, and were trained by Goldberg on what basic information to enter into the TaxWise software, the Refund Advantage bank application, and the FCS virtual terminal.   Goldberg ultimately prepared tax returns for self-employed individuals, individuals with W-2s, and a majority of individuals without any income documents.   One employee stated that when she witnessed Goldberg discussing "education" with his clients, his questions were simply "do you read the newspaper."   All of the clients whose tax returns are referred to specifically in the Indictment (in the form of substantive counts) stated that they did not give Goldberg the figures listed on their Schedule A, Schedule C, Schedule E, and Form 8863.   These clients, including some of own Goldberg's relatives, each stated that Goldberg did not ask them (nor did they provide him) with the amounts for the numerous expenses and income amounts claimed on their tax returns, and further did not provide Goldberg with any documents or receipts for expenses or income claimed on their returns. Other clients, including Goldberg's aunt, the individual identified by the initials M.S. in Count Thirty-Four, stated that Goldberg never made any mention nor discussed the inclusion of any

11511328.1

educational expenses and credits on their returns.

All told, Goldberg prepared or caused to be prepared over 2,700 federal income returns, and roughly the same amount of state returns, during the tax years 2008 through 2011. Goldberg's clients had an aberrationally-high 99 percent refund rate for the over 2,300 federal returns filed in tax year 2011 alone.   Almost all of these tax returns included a claim for the federal American Opportunity Tax Credit,[5] including the $1,000 refundable portion.   While the federal tax returns for that year did not require that a taxpayer disclose the name of the higher education institution to which the alleged tuition payments and other expenses were paid to, the New York State return did.   Each of these clients who applied for the federal education tax credit also applied for the New York State College Tuition Credit, worth between $200 and $400.[6]   For instance, the vast majority of the client-taxpayers' federal returns filed by

---

[5]     The American Opportunity Tax Credit is a tax credit that can be claimed against expenses for the first four years of post-secondary higher education.   It expanded and renamed the already-existing Hope scholarship credit, starting in tax year 2009, and was meant to help students cover the costs of tuition, fees and course materials paid during the taxable year, typically reported on a Form 1098-T, Tuition Statement.   The maximum allowable tax credit is up to $2,500, of which 40% (up to $1,000) is fully refundable, meaning a taxpayer can receive the credit even if he/she owes no federal income taxes.   For more a detailed description of the American Opportunity Tax Credit, please see IRS Publication 970 or visit http://www.irs.gov/uac/American-Opportunity-Tax-Credit:-Questions-and-Answers.

[6]     The New York State College Tuition Credit is a tax credit allowed for qualified college tuition expenses paid for an eligible student.   Qualified tuition expenses include only tuition paid for the undergraduate enrollment or attendance of the student at an institution of higher education.   For taxpayers with allowable expenses of $5,000 or more, the credit equals the applicable percentage of qualified tuition expenses multiplied by 4 percent.   The maximum amount of allowed qualified college tuition expenses is $10,000; therefore, the maximum tuition credit is $400 per eligible student, or $200 if the qualified tuition expenses total less than $5,000. For more a detailed description of the New York State College Tuition Credit, please visit http://www.tax.ny.gov/pit/credits/college_tuition_credit.htm

Goldberg's firm in tax year 2011 included no income information whatsoever; instead, those returns contained only the maximum amount of tuition expenses ($4,000) needed to generate the maximum refundable tax credit ($1,000), from which Goldberg, in turn, deducted his preparer fees.

As noted above, a smaller percentage of the tax returns prepared by Goldberg also included fictitious or grossly overstated Schedule A itemized deductions, fabricated Schedule C business income and losses, and fraudulent Schedule E rental losses.   The inflated itemized deductions typically included false medical and dental expenses, charitable contributions, and/or unreimbursed employee expenses, which, together with other fraudulently claimed tax credits, resulted in higher refunds for Goldberg's clients and enabled them to claim non-refundable and refundable tax credits to which they were not otherwise entitled.   Some of those credits, in addition to the American Opportunity Tax Credit, included the Earned Income Credit, the Child Tax Credit, and the Additional Child Tax Credit.   In the end, Goldberg abused his position and expertise as a tax return preparer to further a pervasive fraud hidden behind a façade of legitimacy, thereby enticing large numbers of people to participate in his wholesale assault upon the Treasury.

### B.   GOLDBERG'S TAX FILING HISTORY

At the same time that he was preparing fraudulent tax returns for his clients, Goldberg was also busy filing fraudulent personal income tax returns for the tax years 2005, 2006, 2007, 2010, and 2011, in which he reported earning wages and accruing withholdings, or claiming tuition expenses, which he did not have.   Specifically, during the tax years 2005, 2006, and 2007, Goldberg contrived wages and withholdings purportedly from his employment with the

13

City of New York upon which he claimed refunds on his federal and state tax returns; in truth and fact, Goldberg had ceased working for the City's Department of Buildings several years earlier.   For the tax years 2010 and 2011, he claimed bogus amounts of tuition credits and tuition expenses, when, in truth and fact, he had not attended nor paid tuition for several years prior to that time.

Meanwhile, after he stopped working for the City of New York and began to devote himself full-time to his tax preparation and computer repair activities, Goldberg failed to disclose any of the income from his business ventures on his personal tax returns.   It is not known for certain how much Goldberg received from these business activities over the years, as many of his clients stated that they paid him in cash.   As a result, it is not possible to determine the exact extent of the tax harm caused by Goldberg's failure to declare his acknowledged business income.   Suffice it to say, however, the Government now urges the Court to take the totality of Goldberg's conduct into consideration at the time of his sentencing.

## IV.   SENTENCING CONSIDERATIONS

### A.   STATUTORY MAXIMUM SENTENCE

Goldberg faces a maximum sentence of 26 years of imprisonment for the offenses of conviction, namely Counts Thirty-Four, Forty-Four, and Forty-Six of the Indictment.   See 26 U.S.C. § 7206(2) (3 years imprisonment); 26 U.S.C. § 7206(1) (3 years imprisonment); 18 U.S.C. § 1343 (20 years imprisonment); see also Plea Agreement, at 1-2.

### B.   SENTENCING GUIDELINES CALCULATION

As noted above, Goldberg reserved the right to challenge the amount of relevant tax and fraud loss computations at a Fatico hearing.   See Plea Agreement, at 3.   After the Court

14

11511328.1

originally scheduled the <u>Fatico</u> hearing to take place on February 27, 2014, the parties jointly requested a continuance in order to allow defense counsel to confer with his client and to permit them additional time to review certain Jencks Act materials which had been produced by the Government in anticipation of the hearing.   <u>See</u> D.E. 34    The Court, in its Order dated February 26, 2014, endorsed this plan, based, in part, upon the parties' representation that this continuance could obviate the need for such a hearing.   <u>See</u> D.E. 35.    Subsequently, on April 28, 2014, the Court endorsed the parties' subsequent correspondence to the Court, dated April 22, 2014, where it was jointly represented that the hearing, now scheduled for May 13, 2014, was no longer necessary as the defendant was waiving the <u>Fatico</u> hearing he had previously sought.   <u>See</u> D.E. 36.   In particular, the parties jointly represented that "there will be *no factual disputes* with respect to the contents of the Probation Department's Pre-sentence investigation report."   <u>Id</u>. (emphasis added).

Having withdrawn his request for a <u>Fatico</u> hearing, and having represented that there was no dispute with the factual findings of the PSR, Goldberg cannot now be heard to complain that the only "reasonable and fair estimation of tax loss" in this case, <u>see</u> D.E. 37 at 6, is for the Court to completely ignore the most significant of the Probation Department's findings: the fraud scheme which Goldberg developed using the education and tuition tax credits, which exceeded $2.5 million in tax year 2011 alone.   <u>See</u> PSR ¶¶ 30, 36.   Any remaining dispute with the PSR's loss computations must therefore be deemed waived, as there was no objection made by the defendant to the Probation Department's factual findings.   Out of an abundance of caution, the Government will nonetheless address each of the defendant's contentions below.

Using the U.S. Sentencing Commission's Guidelines Manual, effective November 1,

11511328.1

2013 and earlier, per U.S.S.G. § 1B1.11, the Government asserts that the following calculation represents the correct computation of the applicable offense level for Goldberg:

| Item | Authority | Offense Level | Total Offense |
|------|-----------|---------------|---------------|
| *Counts 34 and 44* ("*Tax Offenses*"): Aiding and Assisting in the Preparation of False Income Tax Returns; and Subscribing to a False and Fraudulent Income Tax Return | § 2T1.4 § 2T1.1[7] | Determined from § 2T4.1 | |
| Amount of Tax Loss: Not less than $2,500,000 and not more than $7,000,000 | § 2T1.4(a)(1) § 2T4.1(J) | 24 | 24 |
| Specific Offense Characteristic: Defendant was in the Business of Preparing or Assisting in the Preparation of Tax Returns | § 2T1.4(b)(1)(B) | +2 | 26 |
| | | | |
| *Count 46: Wire Fraud* ("*Fraud Offense*") | § 2B1.1(a)(1) | 7 | 7 |
| Specific Offense Characteristic: Loss Exceeded More than $2,500,000 | § 2B.1.1(b)(1)(F) | +18 | 25 |
| Role in the Offense: Defendant Used a Special Skill to Significantly Facilitate the Commission of the Offense | § 3B1.3 | +2 | 27 |
| | | | |
| *Grouping of Tax Offenses and Fraud Offense* | § 3D1.2(b), (d) § 3D1.3(a), (b) | | 27 |
| Acceptance of Responsibility | § 3E1.1(a) § 3E1.1(b) | -3 | **24** |

---

[7] Per U.S.S.G. § 3D1.2(d), all counts involving substantially the same harm shall be grouped together in a single Group "when the offense level is determined largely on the basis of the total amount of harm or loss." Examples used in this section include §§ 2T1.1 and 2T1.4.

11511328.1

The Probation Department, in its initial PSR at paragraph 39, had applied a 2-level enhancement pursuant to § 3B1.3, after determining that the defendant had used a special skill to significantly facilitate the commission of the Tax Offenses.   In its final PSR, however, the Probation Department removed this enhancement as part of its revisions in the Addendum to the PSR, stating, in part, that the enhancements under § 2T1.4(b)(1)(B) and § 3B1.3 are one in the same.   While the Government believes that this enhancement may still yet apply to the computation of the advisory guidelines for the Tax Offenses based upon the particular circumstances of this case, the Government undoubtedly agrees with the Probation Department that the use of special skill enhancement applies to the computation of the advisory guidelines for the Fraud Offense.   See PSR ¶ 35.   This adjustment, in turn, would make the Fraud Offense's adjusted offense level-27 the highest offense level, per § 3D1.3(b).   As such, after taking into account the defendant's acceptance of responsibility, the resulting total offense level would be a level-24, rather than the Probation Department's current level-23 calculation.   See PSR ¶ 45.

### (1)    Amount of Tax Loss: Between $2,500,000 and $7,000,000

The base offense level for Goldberg's offense must correlate to the total "tax loss" caused by the conduct for which he was convicted and all relevant conduct.   See e.g., United States v. Pierce, 17 F.3d 146, 150 (6th Cir. 1994).   In determining total tax loss, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."   U.S.S.G. § 2T1.1, comment. n.2.   Tax loss may include amounts in returns prepared by the defendant but not

17

included in the indictment.   United States v. Higgins, 2 F.3d 1094, 1097-98 (10th Cir. 1993) ("[E]ven uncharged tax losses constitute relevant conduct which a sentencing court may consider in determining the basis offense level tax loss.") see also United States v. Hayes, 322 F.3d 792, 801-02 (4th Cir. 2003) ("while the guidelines preserve a broad range of discretion for district courts, a court has no discretion to disregard relevant conduct in order to achieve a sentence it considers appropriate.").   The district court need only make a reasonable estimate of the loss given the available information using a preponderance of the evidence standard, and such calculations need not be determined with precision.   See, e.g., United States v. Triana, 468 F.3d 308, 320 (6th Cir. 2006).

As noted by the Probation Department, Goldberg's tax loss calculation is based on the Government's good-faith conservative estimate of the actual and intended losses caused by the false and fraudulent returns he prepared on behalf of himself and his client-taxpayers during the relevant prosecution years.   The tax loss calculation has several components:   (a) the actual tax losses caused by the false returns submitted by Goldberg to the IRS and NYS Tax for the tax years 2005, 2006, 2007, 2010 and 2011, totaling **$97,382**; (b) the actual losses caused by the false returns submitted to the IRS for the taxpayer-clients included in the Indictment, totaling **$136,501**; and (c) the losses related to the thousands of tax returns Goldberg submitted to the IRS and NYS Tax on behalf of taxpayer-clients for which he wrongfully claimed education tax credits and deductions allegedly tied to tuition expenses with two institutions—Monroe College ("Monroe") and The City University of New York and its related institutions ("CUNY"), totaling **$2,553,110**.   These two named institutions, which combined make up the majority of the higher education institutions used by Goldberg to improperly claim federal and state education credits

on behalf of his clients, have been able to verify, after an exhaustive search of their records, that more than 2,200 of Goldberg's client-taxpayers never attended nor paid any tuition payments or expenses, thereby making the claimed federal and state tax credits on their returns fraudulent. The combined total of the estimated tax loss attributable to Goldberg is, therefore, approximately **$2,786,993.**

Despite representing to the Court he had no objections to the Probation Department's tax loss computations in waiving the <u>Fatico</u> hearing, the defendant now, in his Sentencing Submission, wants to brush aside all of the losses related to the thousands of tax returns he submitted to the IRS and NYS Tax on behalf of client-taxpayers for which he wrongfully claimed education tax credits and deductions.   <u>See</u> D.E. 37, at 6.   To his credit, Goldberg cannot find any fault with the losses associated with his fraudulent filing of his personal income tax returns or the 40 fraudulent tax returns alleged in the Indictment.   <u>Id</u>.   Each will be addressed in turn.

### a.     Tax Loss Associated with the Defendant's Personal Returns

As noted above, during the same period of time that Goldberg was assisting others in the preparation of false tax returns, an investigation of Goldberg's 2005 through 2007 tax year filings reveal that he falsely claimed tax withholdings on Forms W-2s listing the City of New York as his employer, years after he acknowledged no longer working for the City's Department of Buildings.   These W-2s listed federal income tax withholdings in excess of $28,000 for each year, and state and local income tax withholdings in excess of $21,000.   While Goldberg routinely insisted that his identity was stolen and that someone else must have filed the subject returns during these years, financial records obtained during the investigation conclusively show

19

that the refunds were ultimately deposited into bank accounts which Goldberg controlled.

Meanwhile, for tax years 2010 and 2011, Goldberg knowingly and intentionally claimed fraudulent education expenses of $4,000 in each year on his Form 8863-Education Credits, resulting in an additional refund of $1,000 in each year.   For instance, on his tax year 2011 New York State return, Goldberg claimed on New York State Form IT-272 that he attended New Horizons Computer Learning Center and paid $10,000 for tuition expenses.   Goldberg admitted during his custodial interview that he did not pay tuition to any institution in those years, but claimed that he allegedly had a lifetime enrollment at New Horizons and Chubb Institute, the latter being the institution he listed on his 2010 tax return.   When confronted about the claimed expenses, Goldberg claimed to have had some expenses, such as transportation, books, and software, and that the $10,000 figure in 2011 should have instead been $1,000.   Even if true, the claimed expenses would not have justified the figures listed on his returns.   As such, the following represents the tax loss computations related to the above-described conduct:

| Taxpayer | 2005 | 2006 | 2007 | 2010 | 2011 | TOTAL |
|---|---|---|---|---|---|---|
| Goldberg Federal | $18,699 | $21,061 | $8,815 | $1,000 | $1,000 | **$50,575** |
| Goldberg State | $15,928 | $14,937 | $15,942 | -------- | -------- | **$46, 807** |
| **Tax Due and** | $34,627 | $35,998 | $24,757 | $1,000 | $1,000 | **$97,382** |

It should be noted that these figures are exceedingly conservative since they do not include any tax loss related to Goldberg's failure to declare any income derived from his tax preparation activities during any of the prosecution years.   For example, in tax year 2011 alone, Goldberg earned in excess of $500,000 in fees that were electronically transmitted into his E&M account by April 2012, not to mention the fees that clients paid him in cash, as many confessed they did.

20

### b.     Tax Loss Associated with the Defendant's Client-Taxpayers Charged in the Indictment

The Indictment in this case charged Goldberg with forty counts of aiding and assisting in the preparation of false client-taxpayer returns for the tax years 2006 through 2011.   However, Goldberg's conduct was much broader.   The Government was able to corroborate, through interviews and documentary evidence, that Goldberg filed dozens and dozens of false and fraudulent returns on behalf of clients that, among other things, included fabricated and/or falsely overstated items such as tuition credits, tuition expenses, unreimbursed employee business expenses, medical and dental expenses, gifts to charity, Schedule C business income or losses, Schedule E rental real estate losses, and earned income tax credits.   Many of the clients interviewed also confirmed that Goldberg prepared additional false returns for the same taxpayers in years not charged in the Indictment.   For the sake of simplicity, the Government limited its tax loss computations only to those client-taxpayers and tax years charged in the Indictment, based upon information provided by these clients to the Government.[8]   The total tax loss associated the above-described conduct, which is unchallenged by Goldberg, is **$136,501**. See PSR ¶ 27.

### c.     Tax Loss Associated with Client-Taxpayers for Whom the Defendant Fraudulently Claimed Federal and State Tuition Tax Credits

---

[8]     As noted, additional taxpayer-clients, outside those included in the Indictment, were also interviewed by IRS Special Agents, before and after the Indictment.   These additional taxpayers confirmed that a number of their returns were false and fraudulent in the same or similar manner as the those included in the Indictment.

11511328.1

Most significantly, Goldberg fraudulently included education expenses and credits on thousands of federal and state income tax returns which he prepared on behalf of his clients during the prosecution years.   In particular, during tax year 2011 alone Goldberg filed well over 2,300 federal and companion state returns claiming education credits directly tied to a particular institution of higher education.   The vast majority of these returns claimed no income or withholdings whatsoever, but rather included only alleged educational expenses in a sufficient amount to trigger the refundable federal and state education tax credits.   The 2011 New York State tax returns required the taxpayer to name the higher education institution to which the alleged tuition payments and other expenses were paid to.   Using this information, the Government attempted to verify with the two most frequently named institutions–Monroe and CUNY–whether they had any record of enrollment or payments made by Goldberg's client-taxpayers, as alleged in their 2011 tax filings.   Based upon the verification provided by Monroe and CUNY, which was produced to Goldberg as part of the Government's Jencks Act materials prior to the previously scheduled <u>Fatico</u> hearing, the Government eliminated from the list those taxpayers who, at any time, were confirmed as having any enrollment history with these particular institutions, regardless of the year.

The resulting calculation showed that Goldberg fraudulently claimed that thousands of his client-taxpayers were entitled to claim federal and state education tax credits for having attended either Monroe or CUNY during tax year 2011, when in fact no record existed of them ever having attended the particular institution listed.   For the sake of simplicity, the Government limited the tax loss only to that portion of the federal and state refundable education credits and expenses claimed by these client-taxpayers, rather than any other known falsities on

11511328.1

their returns, which many of the clients confirmed to criminal investigators via interviews. These computations showed that a total of $2,048,589 of federal refundable ($1,000) credits were fraudulently claimed by Goldberg on behalf of his client-taxpayers, and an additional $36,721 in federal education credits were used to offset taxes due (up to $1,500), for a total of **$2,085,310** in fraudulently claimed federal refunds.   Similarly, a total of $**467,800** of state tuition credits were fraudulently claimed by Goldberg on behalf of these client-taxpayers from New York State.[9]   Therefore, in accordance with the Sentencing Guidelines and legal precedents, **$2,553,110** is the reasonable estimate of the total loss amount attributable to Goldberg for those federal and state returns which he prepared and filed on behalf of his client-taxpayers for which he fraudulently claimed tuition and other expenses to Monroe and CUNY, as it is the loss Goldberg "intend[ed] to create when [he] falsified [the subject] tax returns."   United States v. Eye, No. 12-12392, 2013 U.S. App. LEXIS 10857, at *3 (11th Cir. May 20, 2013) (citing United States v. Clarke, 562 F.3d 1158, 1164 (11th Cir. 2009)); see also U.S.S.G. § 2T1.1(c)(1) ("If the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."); id. § 2T1.1(c)(4) ("If the offense involved improperly claiming a refund to which the [defendant]

---

[9]       A spreadsheet showing the names and amounts of Goldberg's client-taxpayers for whom he made fraudulent claims for federal and state education credits and expenses using Monroe and CUNY was produced to the defendant in anticipation of the Fatico hearing.   It was after his review of these materials, as well as the Jencks Act statements of the anticipated witnesses, that the defendant represented to the Court that "there will be no factual disputes with respect to the contents of the Probation Department's Pre-sentence investigation report."   See D.E. 36.

11511328.1

was not entitled, the tax loss is the amount of the claimed refund.").

Interestingly, this amount of **$2,553,110** also constitutes the minimum loss amount applicable to the Fraud Offense guidelines computation in this case.   As alleged in Count Forty-Six of the Indictment, to which Goldberg has pled guilty, the defendant engaged in a scheme to defraud the IRS and NYS through the preparation and filing of false and fraudulent federal and state tax returns for the tax years 2004 *through 2011*.   See D.E. 1.   As noted above, if the Court agrees with the Government that the Fraud Offense is in fact the guideline that produces the highest offense level, the Government urges the Court to make the same findings as to the applicability of §§ 2B1.1(a)(1) (base offense level 7) and 2B1.1(b)(1)(J) (additional 18 level increase) made by the Probation Department with respect to this guideline.   See PSR ¶ 35

In an unpublished decision involving similar circumstances, United States v. Jordan, 374 Fed. Appx. 3, 2010 U.S. App. LEXIS 7393 (11th Cir. Apr. 9, 2010), the Court upheld the district court's finding of a tax loss in excess of 1 million dollars based on an analysis by an IRS Special Agent concerning the defendant's intended tax loss.    In Jordan, the IRS Special Agent testified that he analyzed the 2004 tax year returns filed by the defendant's tax preparation firm and found at least 592 tax returns submitted by the defendant who reported no withholdings and mostly only "S.H.S. income."   Id., at *6.[10]   The Special Agent further testified that, in his experience, it "is highly extraordinary to have many returns claim[ing] solely S.H.S. income out of one preparer shop."   Id.   The 592 tax returns claimed a total of $2.17 million in refunds, which the

---

[10]      The Jordan Court noted that the Special Agent testified that "S.H.S. income" is household income typically reported by domestic workers who are paid less than $1,500 by any given employer, and that these workers do not receive W-2 or 1099 forms.   See 2010 U.S. App. LEXIS 7393, at *6 n.1.

11511328.1

Special Agent believed was the amount of intended loss.   To account for any returns that might

not be fraudulent, however, the Special Agent explained that he took an "ultra conservative"

approach and set aside one half of the 592 returns, not counting the refunds claimed on those

returns in the total loss amount.   Id.   Based on the remaining returns, the Special Agent

concluded that the intended loss was "in excess of a million dollars."   Crediting this testimony,

the district court found by a preponderance of the evidence that the intended tax loss exceeded 1

million.   The Eleventh Circuit Court of Appeals, in sustaining the guidelines findings, held that

the district court did not clearly err in its findings by relying on the Special Agent.   Id., at 8.

In the present case, there is no need to speculate whether the Government mistakenly included in

its tax loss calculations any legitimate returns where Goldberg's client-taxpayers actually paid

tuition or other expenses either to Monroe or CUNY, as listed on their 2011 returns.   To be

clear, any taxpayer with any enrollment or payment history with either of these institutions,

regardless of the year, was not included by the Government in its computations.   Therefore,

there is no need to discount any of the computations of improperly claimed federal and state

tuition tax credits since these institutions have, to-date, provided no evidence of possible

enrollment for these client-taxpayers.

      In contrast with the Government's measured approach outlined above, the defendant asks

this Court to limit the tax loss in this case, to a range of $200,000-$400,000, based mostly on

flimflam.   That is, the defendant claims that "[he] could have prepared an additional 132

fraudulent returns," on top of his acknowledged false personal tax returns and the 40 client

returns charged in the Indictment, and still be within this lower range. See D.E. 37 at 6.   Not

surprisingly, the defendant asks the Court to completely ignore the unchallenged evidence of the

11511328.1

*thousands* of fraudulent federal and state income tax returns which Goldberg submitted claiming wholly bogus education expenses and credits tied to just two institutions, Monroe and CUNY. Moreover, the excuses propounded by Goldberg, that somehow this listing of specific institutions of higher education on the tax forms "was a default code put into the computer software tax program and/or it may have been entered by a member of his staff," see D.E. 37 at 3, flies in the face of that fact that any so-called default code would presumably have affected every other purchaser of the TaxWise software during tax year 2011, of which there is no evidence.   Or the fact that if it was truly a "default code" one would expect the software to list one, rather than many different institutions, as was the case with the returns submitted by Goldberg's firm. Additionally, each of the defendant's employees who were interviewed by criminal investigators stated that their primary function was to enter the taxpayer-client identifying information into the FCS virtual terminal, adding that it was Goldberg who prepared the tax returns or instructed his employees on what to include.

In the end, the Government believes that the loss figures arrived at by the Probation Department, to which the defendant previously informed the Court he did not have any objection, represent a conservative calculation from which this Court can arrive at the appropriate advisory Sentencing Guidelines computation here.

### (3)    Specific Offense Characteristic: Tax Preparation Business

Based on the evidence uncovered to date, it is un-contradicted that Goldberg was in the business of preparing or assisting in the preparation of tax returns, thus warranting a two-level upward adjustment pursuant to U.S.S.G. § 2T1.4(b)(1)(B).   See United States v. Aragbaye, 234 F.3d 1101, 1106-07 (9th Cir. 2000) (upholding tax preparer enhancement for a defendant who is

in the business of preparing fictitious tax returns).    In fact, Goldberg himself admits being in the business of preparing client tax returns since approximately 2004, continuing throughout the period of prosecution until at least 2012.   See D.E. 37 at 2.

Alternatively, if the enhancement under U.S.S.G. § 2T1.4(b)(1)(B) is not applied for whatever reason, the Government will urge the Court to apply a two-level upward adjustment pursuant to U.S.S.G. § 2T1.4(b)(1)(A), as the evidence also demonstrates that Goldberg committed the offenses of conviction as part of a pattern or scheme from which he derived a substantial portion of his income.

### (4)    Role in the Offense: Use of Special Skill

In the parties' Plea Agreement, Goldberg agreed that his conduct warranted a 2-level enhancement because he used a special skill in a manner that significantly facilitated the commission or concealment of the offense, thereby making his fraudulent refund scheme that much more successful.   See U.S.S.G. § 3B1.3.   As noted above, the Probation Department had agreed that this enhancement applied in its initial draft PSR, before removing it from its final PSR.   See PSR Addendum.   Relying on the same arguments made by the Probation Department, the defendant, in his Sentencing Submission, now asserts that this special skill role enhancement should not apply as it is one and the same with the sentencing enhancement for being in the business of preparing tax returns.   See D.E. 37 at 10.   While the Government will not continue to press the position that this adjustment is indeed applicable to the Tax Offenses, it asks that this adjustment certainly still apply to the calculation of the Fraud Offense.   See PSR ¶ 35.

Special skills refer to skills "not possessed by members of the general public and usually

requiring substantial education, training or licensing." Id. comment. (n.4).   The Second

Circuit, in United States v. Fritzson, 979 F.2d 21, 22-23 (2d Cir. 1992), made clear that a

professional tax preparer's "knowledge of the withholding process, including the roles of the

claim and transmittal documents, and how and when to file them, exceeds the knowledge of the

average person," thus justifying a special skill enhancement.   While Goldberg has repeatedly

sought to downplay his knowledge of the tax laws and emphasize his lack of a formal accounting

education, it is clear that he used his extensive knowledge of IRS procedures and tax forms,

including Schedule A-Itemized Deductions, Schedule C-Profit or Loss from Business, Schedule

E- Supplemental Income or Loss, and Form 8863-Education Credits, in addition to the American

Opportunity Tax Credit, the Earned Income Credit, the Child Tax Credit, and the Additional

Child Tax Credit, to carry out a vast fraud scheme that resulted in losses in the millions.

Moreover, as in Fritzson, the defendant here utilized his knowledge of the IRS withholding

forms to carry out the preparation of false returns for himself, where he falsely claimed

withholding amounts from the City of New York.   See also United States v. Noah, 130 F.3d

490, 500 (1st Cir. 1997) (applying enhancement to a professional tax preparer who, though not

specially educated, was paid fees to process tax returns, file them electronically, and arrange

refund anticipation loans); United States v. Hollender, 85 Fed. Appx. 787, 789 (2d Cir. 2004)

(unpublished) ("although [defendant] did not have any formal tax training, the [special skill]

enhancement was still proper because members of the general public are not likely to know how

to incorporate corporations or prepare W-2s.").

It should also be pointed out that Goldberg's "special skill" also included his knowledge

of the electronic tax filing procedures, which he exploited in his efforts to conceal his ongoing

crimes of presenting fraudulent client tax returns after he had been suspended from filing returns by the IRS.   As noted above, Goldberg caused not only one of his employees, Patricia Nuñez, but also his father, Stuart Goldberg, to apply for EFINs in order to allow him to submit thousands of returns to the IRS and NYS Tax after his own EFIN had been suspended.

(5)      **Final Guidelines Calculation**

Based upon the foregoing, the Government submits that Goldberg's total offense level for the Tax Offenses is a level 26 and for the Fraud Offense a level 27.   After the grouping considerations and a reduction for acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b), as contemplated in the parties' Plea Agreement, the resultant final adjusted offense level is a level 24, rather than the level 23 currently estimated by the Probation Department.[11]

Using Criminal History Category II, as determined by the Probation Department, see PSR ¶ 51, the resulting advisory sentencing guideline range is 57-71 months of imprisonment.

---

[11]      The Government must make mention here that it is troubled that the defendant, in his Sentencing Submission, seems to repeatedly deflect blame for his crimes onto others, including his clients and employees, and further indicates that he had little to no responsibility for the conduct which led to his Indictment and eventual guilty plea to all the offenses of conviction.   See, e.g., D.E. 27 at 6 ("The deduction of these educational expenses which were not incurred in relationship to an accredited institute of higher learning were in fact incorrect and illegal but Mark did not know that at the time and cannot be criminally liable for false information he provided in good faith and included on clients' tax returns in good faith."). Pursuant to the terms of the parties' Plea Agreement, the Government must be satisfied that the defendant has accepted responsibility for his criminal conduct before it will move the Court, pursuant to U.S.S.G. § 3E1.1(b), for an additional one-level reduction in the total offense level. See Plea Agreement, at 4.   Goldberg comes perilously close to denying, time and time again, any culpability for the Fraud Offense he has previously pleaded guilty to.

11511328.1

V.      **SECTION 3553(A) FACTORS**

A.      **OVERVIEW**

The Supreme Court has declared:  "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).  As such, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

In determining the appropriate sentence to be imposed upon Goldberg, this Court must also consider all of the sentencing considerations set forth in Title 18, United States Code, Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).[12]

---

[12]      The "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  However, district court judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence

11511328.1

**B.**     CONSIDERATION OF THE SECTION 3553(A) FACTORS

Goldberg faces sentencing after many years of flagrant disrespect for the U.S. legal system.   Consideration of the 3553(a) factors, as explained below, call for meaningful punishment.

### (1)     A Guidelines Sentence Reflects the Seriousness of Goldberg's Offense

The Section 3553(a) factors include the "nature and circumstances of the offense," as well as the "seriousness of the offense," --- which in this case fully supports a Guidelines sentence.   Tax fraud is a serious offense – akin to stealing.   The Supreme Court has long-recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received."   Spies v. United States, 317 U.S. 492, 495 (1943).   A functioning government relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes.   Indeed, as Justice Oliver Wendell Holmes stated, "[t]axes are what we pay for a civilized society . . . ."   Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

---

necessary to achieve the purposes set forth in § 3553(a)(2).   See United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006).   "[W]e do not think that the 'not greater than necessary' language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate."   United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006).

31

Preparing thousands of false income tax returns that cheated the United States Government and the State of New York out of millions of dollars is an extremely serious crime. While the Government is asking for a significant term of imprisonment, such a request is justified.  The victims of Goldberg's offense, aside from his former clients who now have problems with the IRS and NYS Tax collection authorities as a result of the returns prepared by Goldberg, are *all* the honest and hardworking American citizens and residents who go to work each day and pay their fair share of taxes as the law requires of them.

### (2) Goldberg's History and Characteristics Support a Guidelines Sentence

Section 3553(a)(1) also instructs the Court to consider a defendant's characteristics in fashioning a reasonable sentence.   In this case, Goldberg's history and characteristics support a Guidelines sentence.  Goldberg misused his skills and training to obtain large unwarranted refunds for his clients by preparing blatantly false income tax returns.  He further directly benefitted from his scheme by taking a large portion of his clients' inflated refunds as a "fee" for his services.   Goldberg also showed his utter disregard for the nation's tax laws by reporting *none* of the income he received from his tax preparation activities, despite first-hand knowledge of his obligation to do so.

While the Government did not seek any enhancement for obstruction of justice in this case, defendant's conduct during earlier proceedings in this prosecution raises disturbing questions concerning his character and history.   More specifically, in a supplemental filing in support of his <u>Monsanto</u> motion for the release of a portion of the seized funds in order to pay his retained counsel, <u>see</u> D.E.'s 6 and 6-2, the defendant attached affidavits from five separate

32

clients who had their 2011 personal income taxes prepared by his firm, E&M, during the 2012

tax season.   See D.E. 18, ¶10.   According to the defendant, these five clients affirmed "that

they knew about the refundable education tax credits from word of mouth before they went to

E&M Multi Services Inc. to have their taxes prepared and they voluntarily requested E&M Multi

services staff to prepare their tax returns by claiming their education expenses without any

suggestions from the E&M Staff."   Id.; see also D.E. 18-1, Goldberg Affidavit dated 4/5/13, at

¶ 9 ("Many of the clients who utilized our tax preparation service were aware of the

deductibility of educational expenses and came to us with the amount of educational expenses

that they allegedly incurred during the year and requested us to prepare their returns utilizing

these deductions.").   The five clients for whom the defendant submitted affidavits are: (1)

Michael Arce; (2) Raul Santana; (3) Dora Gonzalez; (4) Jose Medina; and (5) Christine Kross.

See D.E. 18-2.   Each affidavit is identical to the others in terms of their written declarations, the

only differences being that blank spaces for the name of the affiant have been filled out in the

name of each of the five clients, and the clients's signatures appear at the end of the document,

purportedly witnessed by a notary public.[13]

---

[13]        Each of the five affidavits submitted by the defendant to the Court, purportedly
signed between the dates of April 3-5, 2013, stated as follows:

      1.        I had my 2011 tax returns prepared by Mark Goldberg and/or E&M Multi
           Services Inc. during the 2012 tax season as a tax preparer.

      2.        I came to this tax preparation service to prepare my tax returns utilizing
           the refundable educational tax credits without any suggestions from their
           staff.   I had heard about such refundable educational tax credits from
           word of mouth and requested a refund based upon such credits.   I was
           unaware of any requirement that such tax credits had to be based upon
           tuition and related expenses affiliated with the attendance at authorized
           institutions of higher learning.

See D.E. 18-2.

11511328.1

The above-five identified clients of Goldberg were subsequently interviewed by Special Agents of the IRS within weeks of signing their affidavits.   In each instance, the clients stated that the representations made in these affidavits were false and/or misleading, and that they only signed the affidavits at the request of the defendant without reading the statements or fully understanding their import.   Upon being interviewed by IRS, each of the five clients disavowed the fact that they, rather than the defendant or his staff, were the impetus behind their claims of refunds based on the refundable educational tax credits.   It is the Government's contention that the defendant's actions were designed to mislead the Court in its fact-finding regarding the then-pending <u>Monsanto</u> motion, clearly showing the true character of the defendant. Goldberg's intent then, as it is now, is to sell a narrative in which he minimizes his own responsibility for the rampant criminal activity that took place in this case.   While the Government was limited pursuant to the parties' Plea Agreement in seeking an enhancement against the defendant for an obstruction of justice pursuant to U.S.S.G. § 3C1.1, it certainly believes that this conduct should be part of the Court's consideration when determining the defendant's character and history in fashioning his sentence.

In any event, nothing in the defendant's personal characteristics certainly warrants a downward departure or a variance, as he now suggests in his own Sentencing Submission.

### (3)      Deterrence and Respect for the Law

Additionally, a Guidelines sentence in this case adequately addresses, in accordance with Section 3553(a), the need for the sentence imposed "to promote respect for the law," as well as "the need to afford adequate deterrence to criminal conduct."   The need for deterrence in this case warrants a strong sentence.   In some sense, the need for deterrence in tax-fraud sentences—

more so than perhaps other crimes— is apparent from the relevant numbers:   the number of taxpayers in the United States far, far exceeds the number of auditors and criminal investigators available at the IRS.[14]   Courts have routinely recognized this dynamic, as noted in <u>United States v. Ture</u>, 450 F.3d 352 (8th Cir. 2006):

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violation, deterring others from violating tax laws is a primary consideration underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

<u>Id.</u> at 357 (<u>quoting</u> U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt).

Tax fraud schemes like the one cultivated by Goldberg undermine the trust that is essential to the proper functioning of our revenue laws.   Goldberg's actions thereby forced other community members to carry an extra burden in order to accomplish the daily work of local, state, and federal Governments.   This case presents a powerful need and opportunity for this Court to deter similar tax frauds.   Absent such deterrence, other tax return preparers – and particularly those located in underprivileged neighborhoods serving clients who may be unsophisticated in the nuances of the tax laws– will see the result in this case and cynically conclude that the risks of being caught and punished for tax fraud do not outweigh the potential rewards.

---

[14]    As of March 2005, the overall gross tax gap – the difference between what taxpayers should have paid and what they actually paid in taxes on a timely basis – was between $312 and $353 billion in 2001.   That means taxpayers failed to pay over $300 billion dollars owed in taxes to the United States.   <u>See</u> IR-2005-38, Mar. 29, 2005.

11511328.1

Additionally, it is important to fashion a sentence that will protect the public from further crimes by Goldberg.   The Sentencing Guidelines call for imprisonment because such sentences deter people like the defendant who commit white-collar crimes and flaunt the federal tax system.   In this case, real deterrence can be achieved only by a significant jail sentence.

### (4)     Need to Provide Educational or Vocational Training

The need to provide Goldberg with any educational or vocational training, medical care, or other correctional treatment is not a factor in this case.

### (5)     Sentencing Guidelines and the Need to Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense.   The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify a serious problem in the criminal justice system:   "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."   See   U.S.C.C.A.N., 98th Cong., 2nd Sess. (1984) at 3260.   As Justice Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its date significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.   The Commission's statistics indicated that where white-collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.   To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

11511328.1

See Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest," 17 Hofstra L. Rev. 1, 20 (1988).   This approach provides just punishment for the considerable harm that white collar crimes cause society.

In the Government's view, the advisory Sentencing Guidelines range described above reflects the seriousness of the offense, promotes respect for law, and provides for just punishment in this case.   The Government's recommendation of a sentence within the advisory guidelines range of 57–71 months of imprisonment for Goldberg is based, in part, on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing.   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role:   It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" Id. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).   As the Supreme Court stated:   "[w]e have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).

Furthermore, the advisory guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the

Sentencing Reform Act of 1984.   Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments.   Even under the current advisory system, district courts must meaningfully consider § 3553(a)(4), i.e., the applicable category of offense as set forth in the guidelines.   See United States v. Booker, 543 U.S. 220 (2005); see also United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005) (explaining that the "Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.").

Some examples of sentences imposed in tax preparer cases around the country include the following:

- In October 2009, Marcel Toto-Ngosso (District of Maryland) was sentenced to a total of 70 months imprisonment, in addition to being ordered to pay $238,788 in restitution, in connection with a criminal scheme to generate fraudulent tax refunds for his taxpayer-clients.   From at least 1998 through 2007, Toto-Ngosso ran a tax preparation business from his home, from where he prepared fraudulent client returns which claimed false deductions, expenses, and credits, including false dependents.   Toto-Ngosso obtained the names and social security numbers of individuals, which he later sold to his clients as dependents and qualifying persons for $500 to $800 each.   Toto-Ngosso then used these names and social security numbers on his clients' tax returns to secure larger refunds.

- In July 2009, Neyembo Mikanda (District of New Jersey) was sentenced to a total of 84 months in prison following his conviction of defrauding the IRS through the preparation of

11511328.1

false individual income tax returns for his clients and filing false corporate tax returns for companies he controlled.   In addition, Mikanda was ordered to pay approximately $216,983 in restitution.  Mikanda had owned and operated a tax preparation business known as Public Synergies, Inc. located in Williamstown, New Jersey.   From September 2004 through April 2004, Mikanda prepared and filed false individual income tax returns and amended tax returns for his clients containing fabricated and inflated itemized deductions that included deductions for taxes paid on purchases, gifts to charity, and job expenses.

- In August 2008, Deborah R. Adams (Northern District of Florida), operator of Archer Tax and Accounting Services, was sentenced to 60 months in prison and ordered to pay $62,802 in restitution to the IRS.  Adams pleaded guilty in May 2008 to 31 counts of preparing and filing false federal income tax returns and 13 counts of identity theft. According to court documents, she filed 31 false federal income tax returns during tax years 2003 through 2005.  Adams also prepared false returns with the personal identity information and Social Security numbers stolen from former clients and had the false refunds also deposited to bank accounts she controlled.   Adams filed fraudulent claims for tax refunds totaling $102,000.

- In May 2008, Romanus Okorie (District of New Jersey) was sentenced to 72 months in prison for filing fraudulent tax returns on behalf of numerous New Jersey residents resulting in a loss to the Government in excess of $2.5 million. Okorie was also ordered to pay a $100,000 fine and was prohibited from working as a tax preparer for three years following his release from prison. A jury had convicted Okorie of 10 counts of willfully

preparing materially false tax returns.   Evidence presented at trial showed that more than 100 clients were audited, and the total tax loss based on the audited returns exceeded $1 million.   The Government presented further evidence that in 2003 Okorie prepared approximately 250, and in 2004 close to 300, tax returns, all but one generating a refund. The Government estimated that the actual tax loss for the returns prepared by Okorie ─ more than 600 ─ exceeded $4 million.

- In February 2008, Lloyd Anthony Bastfield (Western District of North Carolina), a professional tax return preparer was sentenced to 70 months in prison and ordered to pay $6 million in restitution.   Bastfield pleaded guilty in April 2007 to conspiring to defraud the United States by filing false tax returns claiming nearly $6 million in false claims for refunds for individuals between 2001 and 2005, and evading over $171,000 in personal income taxes owed by him for the years 2000 through 2004.   According to a Bill of Information, Bastfield admitted that between 2001 and 2005, he prepared and electronically filed more than 10,000 fraudulent income tax returns for individual clients which claimed false and fictitious education income tax credits.

Here, Goldberg's criminal conduct warrants as significant a prison sentence as those described above.   Goldberg's criminal conduct, in fact, may be substantially broader than the examples cited, as he prepared *thousands* of false returns for clients, which in turn produced a large amount of income which he failed to report, despite his knowing obligation to do so.

* * * *

For all of these reasons, a sentence within the Guidelines range is the appropriate sentence here.   There are no other Section 3553(a) factors in this particular case which militate

11511328.1

against imposition of a such a sentence upon Goldberg; to the contrary, the 3553(a) factors on balance support the imposition of the recommended guideline punishment.

## VI.   **RESTITUTION**

Finally, an order of restitution in this case is warranted.   See 18 U.S.C. §§ 3663, 3663A. As noted above, the Government has been able to determine that **$2,728,315.77** is the total amount of restitution due from the defendant to the United States of America and the State of New York, after being given credit for any amounts recovered by the IRS and NYS Tax or which, through their diligence, was not issued to the taxpayer-clients.   The total restitution due to the United States of America is **$2,215.708.77.**   This figure is comprised of the following: (a) the unpaid amount for the defendant's federal income taxes for the charged years, totaling **$20,699.00**; (b) the unpaid amount for the 40 counts charged in the Indictment, totaling **$120,105.77**; and (c) the amount of unlawful Federal education credits claimed, totaling **$2,074.904.00 --** $2,040,000.00 corresponding to the refundable $1,000 education credits claimed, and $34,904.00 corresponding to the Federal education credits used to offset taxes.

The restitution due to the State of New York is **$512,607.00**.   This figure is comprised of the following:   (a) **$46,807** for Goldberg's unpaid State income tax deficiency for tax years 2005, 2006, and 2007; and (b) **$465,800.00** for the total unlawful State tuition credits issued and not recovered (based on $902,515.00 in State refunds claimed and $490,702.22 in State refunds issued).   The Government will provide the Court with a proposed restitution order at sentencing.

## VII.   **CONCLUSION**

For all of the above stated reasons, the Court should impose a sentence upon Mark Goldberg within the advisory guidelines range of 57-71 months in prison and order him to pay

11511328.1

restitution in the total amount of 2,727,381.77 to the United States of American and the State of New York.   Additionally, the Court should order a money judgment against Goldberg in the amount of $500,000, which will be reduced by $403,915.61, represented in the Cashier's Check presently in the Government's possession.

Dated:     New York, New York
           June 3, 2014

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York.

                                  By:  /s/ Jorge Almonte
                                        JORGE ALMONTE (DC Bar #481391)
                                        Trial Attorney
                                        U.S. Department of Justice, Tax Division
                                        Northern Criminal Enforcement Section
                                        601 D Street, N.W. – RM 7548
                                        Washington, DC 20530
                                        Direct: (202) 305-3676
                                        Fax: (202) 616-1786
                                        Jorge.Almonte@usdoj.gov

                                        /s/ Stanley J. Okula, Jr.
                                        STANLEY J. OKULA, Jr.
                                        Assistant United States Attorney
                                        Southern District of New York
                                        1 St. Andrew's Plaza
                                        New York, NY 10007
                                        Main: (212) 637-2200
                                        Stan.Okula@usdoj.gov

11511328.1

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on June 3, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Glenn H. Ripa, Esq.
*Counsel to Defendant Mark Goldberg*

 /s/ Jorge Almonte
Jorge Almonte
Trial Attorney
U.S. Department of Justice, Tax Division

11511328.1